## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

ROBERT BURNHAM and MICHAEL
ASHKER, in both his individual capacity
and in his capacity as the Sellers
Representative under the Parties' May 5,
2023 Membership Interest Purchase
Agreement,

                    Plaintiffs,

v.

COMPASS MINERALS
INTERNATIONAL, INC. and
COMPASS MINERALS AMERICA,
INC.,

                    Defendants.

**No. 25 Civ. 3892 (RMB) (OTW)**

**Oral Argument Requested**

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**Cahill Gordon & Reindel LLP**
Joel Kurtzberg
Sesi Garimella
Jason M. Ecker
32 Old Slip
New York, NY 10005
(212) 701-3000

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ....................................................................................................5

    A.    Plaintiffs Grew Fortress into a Leader in the Fire Retardant Industry....................5

    B.    Compass Acquired Fortress .....................................................................................6

    C.    Compass Breached the MIPA ..................................................................................9

    D.    Time Is of the Essence ..........................................................................................10

LEGAL STANDARDS .......................................................................................................11

ARGUMENT .....................................................................................................................11

    I.    Plaintiffs Are Likely to Prevail on Their Breach of Contract Claim .....................11

    II.    Plaintiffs Will Suffer Irreparable Harm Without Injunctive Relief.......................14

    III.    The Balance of Equities Weighs Decisively in Plaintiffs' Favor ..........................17

    IV.    Injunctive Relief Serves the Public Interest...........................................................18

CONCLUSION..................................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andino* v. *Fischer*,
  555 F. Supp. 2d 418 (S.D.N.Y. 2008)......................................................................................... 11

*Benihana, Inc.* v. *Benihana of Tokyo, LLC*,
  784 F.3d 887 (2d Cir. 2015)..................................................................................................... 11

*Brenntag International Chemicals, Inc.* v. *Bank of India*,
  175 F.3d 245 (2d Cir. 1999)..................................................................................................... 15

*Ecolab, Inc.* v. *K.P. Laundry Machine, Inc.*,
  656 F. Supp. 894 (S.D.N.Y. 1987) .......................................................................................... 15

*Espiritu Santo Holdings, LP* v. *L1bero Partners, LP*,
  2019 WL 2240204 (S.D.N.Y. May 14, 2019) .......................................................................... 19

*Gulf & W. Corp.* v. *Craftique Prods., Inc.*,
  523 F. Supp. 603 (S.D.N.Y. 1981) .................................................................................... 15, 16

*Jacobson & Co.* v. *Armstrong Cork Co.*,
  548 F.2d 438 (2d Cir. 1977)..................................................................................................... 16

*Keiler* v. *Harlequin Enters. Ltd.*,
  751 F.3d 64 (2d Cir. 2014)....................................................................................................... 13

*Mahmood* v. *Nielsen*,
  312 F. Supp. 3d 417 (S.D.N.Y. 2018)...................................................................................... 11

*Marsh & McLennan Agency, LLC* v. *Alliant Insurance Servs., Inc.*,
  2025 WL 304500 (S.D.N.Y. Jan. 27, 2025) ............................................................................. 17

*National Elevator Cab & Door Corp.* v. *H&B, Inc.*,
  282 F. App'x 885 (2d Cir. 2008) ............................................................................................. 17

*Nimbus Therapeutics, LLC* v. *Celgene Corp.*,
  570 F. Supp. 3d 100 (S.D.N.Y. 2021)...................................................................................... 13

*North Atlantic Instruments, Inc.* v. *Haber*,
  188 F.3d 38 (2d Cir. 1999)....................................................................................................... 17

*Register.com, Inc.* v. *Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004)..................................................................................................... 14

*Reuters Ltd.* v. *United Press International, Inc.*,
  903 F.2d 904 (2d Cir. 1990)...................................................................................................... 14

*Rex Medical L.P.* v. *Angiotech Pharmaceuticals (US), Inc.*,
  754 F. Supp. 2d 616 (S.D.N.Y. 2010)........................................................................................ 18

*RMP Capital Corp.* v. *Bam Brokerage*, Inc.,
  21 F. Supp. 3d 173 (E.D.N.Y. 2014) ......................................................................................... 15

*Roswell Capital Partners LLC* v. *Alternative Construction Technologies*,
  2009 WL 222348 (S.D.N.Y. Jan. 30, 2009) ............................................................................... 17

*Ticor Title Insurance Co.* v. *Cohen*,
  173 F.3d 63 (2d Cir. 1999)......................................................................................................... 17

*trueEX, LLC* v. *MarkitSERV Ltd.*,
  266 F. Supp. 3d 705 (S.D.N.Y. 2017)........................................................................................ 15

*Vestron, Inc.* v. *National Geographic Society*,
  750 F. Supp. 586 (S.D.N.Y. 1990) ............................................................................................ 16

*Wells Fargo Bank, N.A.* v. *Bank of America, N.A.*,
  2013 WL 372149 (S.D.N.Y. Jan. 31, 2013) ..................................................................... 13, 16-17

*Yang* v. *Kellner*,
  458 F. Supp. 3d 199 (S.D.N.Y. 2020), *aff'd sub nom. Yang* v. *Kosinski*, 805 F. App'x 63 (2d
  Cir. 2020), *and aff'd sub nom. Yang* v. *Kosinski*, 960 F.3d 119 (2d Cir. 2020) ....................... 18

*Zam & Zam Super Market, LLC* v. *Ignite Payments, LLC*,
  736 F. App'x 274 (2d Cir. 2018) ............................................................................................... 11

**Rules**

FED. R. CIV. P. 65...................................................................................................................... 1, 4

Plaintiffs Robert Burnham ("Burnham") and Michael Ashker, in both his individual and representative capacity ("Ashker"), seek a temporary restraining order and preliminary injunction pursuant to Federal Rule of Civil Procedure 65 to prevent Defendants Compass Minerals International, Inc. and Compass Minerals America, Inc. (together, "Compass" and with Plaintiffs, the "Parties") from selling Fortress North America LLC ("Fortress" or the "Company") or Fortress' assets to a third party, in direct violation of their contractual obligations to Plaintiffs. Compass purchased Fortress from Burnham and Ashker pursuant to a May 5, 2023 Membership Interest Purchase Agreement ("MIPA"),[1] which required Compass to operate Fortress as a separate entity with Fortress' existing name and independent branding for a period of at least two years (*see* Ex. A (MIPA) § 2.08(c)(i)(C))—something Compass undisputedly failed to do. The now imminent sale of Fortress and/or its assets to a third party threatens a permanent end to the Company, causing Plaintiffs serious and irreparable harm, and undermining the relief sought in this litigation. Immediate injunctive relief is necessary to preserve the status quo.

## PRELIMINARY STATEMENT[2]

A temporary restraining order ("TRO") and preliminary injunction are urgently needed to prevent the impending sale of Fortress or its assets to a third party. Any such sale would directly violate the terms of the MIPA, which requires Compass to operate Fortress as a separate entity using its existing name and independent branding for a period of at least two years—something that Compass has done for only a few months. The contract expressly provides for specific performance in the event of such a material breach.

---

[1] A copy of the MIPA is attached to the May 20, 2025 Declaration of Joel Kurtzberg ("Kurtzberg Decl.") as Exhibit A. Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Parties' MIPA.

[2] Unless otherwise indicated, all internal citations and quotations are omitted, and all emphasis is added.

Time is of the essence. Since Plaintiffs filed this action on April 8, 2025, they have been engaged in active discussions with Compass in a good faith attempt to resolve this dispute. The Sellers Group was led to believe that a deal or resolution was imminent. Those efforts came to a screeching halt on May 2, 2025, when negotiations were cut off by Compass. Then, on May 5, 2025, representatives from Compass informed Plaintiffs that Compass had entered into an exclusive 20-day period with a potential buyer of Fortress and/or its assets. That exclusivity period will end on Thursday, May 22, 2025. Despite this disappointing news, Plaintiffs continued to make multiple attempts to engage in further meaningful negotiations that would avoid the need for this Court's intervention. However, it appears that a sale of Fortress and/or its assets to a third party is now imminent. Once that sale occurs, it will destroy any remaining value that the Fortress brand still has, rendering Plaintiffs' prayer for relief impossible.

Plaintiffs are the co-founders of Fortress, an industry leader in the development, manufacturing, and distribution of aerial and ground fire retardants used by government agencies to combat wildfires. Burnham was the Chief Executive Officer and a Board Member of Fortress, and, as of 2018, owned approximately 23% of the Company. Ashker was the Chief Operating Officer and Chief Financial Officer and a Board Member of Fortress, and, as of 2018, owned approximately 19% of the Company. The aerial fire retardant industry is a very small one—Fortress is one of only two competitors in the entire industry.

Compass was an early investor in Fortress, a strategic relationship that began in 2019 and evolved over time, whereby Compass gradually increased its investment until it came to own an approximately 45% minority stake in the Company by October of 2021. Then, on May 5, 2023, fueled by the success of Fortress' products in U.S. Forest Service testing and the closing of a $23 million dollar contract with the U.S. Forest Service, the Parties entered into the MIPA, under which

Compass purchased the remaining shares of Fortress. Burnham and Ashker were part of a "Sellers Group," consisting of approximately 25 Fortress owners, including early investors and employees. The entire Sellers Group is now represented by Ashker as the "Sellers Representative" in the transaction.

Under the deal, the Sellers deferred the lion's share of their compensation from the sale of the Company in favor of performance-based payments tied to Fortress' future sales. (*See* Ex. A (MIPA) § 2.02(a).) Crucially, to ensure the Company's successful performance, Compass agreed to continue operating Fortress as a separate entity with Fortress' existing name and independent branding for a period of at least two years. (*See id.* § 2.08(c)(i)(C).) While Fortress already had considerable goodwill within the tightknit fire retardant industry, Compass was making its first foray into the industry and had no prior experience dealing directly with the U.S. Forest Service. Ensuring that Fortress maintain its goodwill and name-recognition—a brand synonymous with innovation—was imperative to its continued success and was a material term for the Sellers Group. To further help preserve the Fortress brand, the MIPA explicitly contemplated—and Compass in fact insisted—that Burnham and Ashker would remain in charge of the business for another two years, each signing new employment agreements as CEO and COO, respectively. (*See id.* § 2.03(b).)

Unfortunately, within months of signing the MIPA, Compass began to dismantle Fortress piece-by-piece. Compass removed all of Fortress' branding and marketing, shut down Fortress' independent website, directed all communications through Compass' public relations and marketing teams, and both fired and demoted several of Fortress' most important employees, including but not limited to Burnham and Ashker. These ill-advised (and impermissible) actions by Compass proved disastrous for Fortress' business. On March 25, 2025—less than two years

3

after the May 5, 2023 purchase—Compass publicly announced its decision to shut down Fortress and layoff the Company's entire workforce.

As a result, Plaintiffs filed this action, asserting claims for breach of contract and specific performance, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and seeking declaratory judgment. (ECF No. 1-2.)  Among other relief, Plaintiffs seek specific performance of the MIPA—which expressly provides for such a remedy, (Ex. A (MIPA) § 8.11)—including the continued operation of Fortress' business as a separate entity from Compass with its own independent branding, and an injunction barring any sale of Fortress or its assets. (*Id.*)

Against this backdrop, Plaintiffs have met the requirements for issuing a temporary restraining order and preliminary injunction under Federal Rule of Civil Procedure 65. ***First***, Plaintiffs are likely to succeed on the merits of their claims.  The MIPA required Compass to operate Fortress as a separate entity with independent branding for at least two years.  Not only did Compass begin to dismantle Fortress as an independent brand within months of signing the MIPA, but Compass shut down Fortress' entire business before the two-year period had been completed. ***Second***, Plaintiffs will suffer irreparable harm without injunctive relief.  The sale of Fortress' assets will permanently destroy its business and goodwill—rendering the primary relief Plaintiffs seek an impossibility.  Moreover, damages for such a breach cannot be readily calculated, and the Parties expressly provided in the MIPA that the contract shall be specifically enforced and a material breach would necessarily constitute irreparable harm to be remedied by an injunction. (*See* Ex. A (MIPA) § 8.11(a).) ***Third***, the balance of the equities favors an injunction.  While Plaintiffs would be irreparably harmed by a sale of Fortress and/or its assets, an injunction would only subject Compass to a minor delay of any potential sale.  If the injunction were to be lifted, Compass would be placed back in the same position it is today. ***Fourth***, an injunction serves the

4

public interest by preventing the removal of a competitor in the already highly concentrated fire retardant industry, and by enforcing the terms of the Parties' clear and unambiguous contract.

For these and the reasons below, this Court should grant Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction.

## STATEMENT OF FACTS

### A.    Plaintiffs Grew Fortress into a Leader in the Fire-Retardant Industry

In or around 2018, Plaintiffs Burnham and Ashker co-founded Fortress, an industry leader in the development and distribution of fire retardants used to combat wildfires.  (May 20, 2025 Declaration of Robert Burnham ("Burnham Decl.") ¶ 1; May 20, 2025 Declaration of Michael Ashker ("Ashker Decl.") ¶ 1.)  Burnham was the Chief Executive Officer and a Board Member of Fortress, and, as of 2018, owned approximately 23% of the Company.  (Burnham Decl. ¶ 2.) Ashker first served as the Chief Financial Officer and Head of Business Strategy of Fortress, before transitioning to the roles of Chief Operating Officer and Vice President of Finance.  (Ashker Decl. ¶ 2.)  Ashker was also a Board Member of Fortress, and, as of 2018, owned approximately 19% of the Company.  (*Id*.)

Under the leadership of Burnham and Ashker, the Company quickly built up a significant reputation and developed goodwill in an extremely consolidated industry.  Plaintiffs have invested years of hard work into developing the Fortress brand.  In 2022, those efforts culminated in Fortress becoming the first new company in over two decades to have its products added to the U.S. Forest Service's Qualified Products List.  (Ashker Decl. ¶ 3.)  That achievement made the Company a significant player in an industry in which only one other company had achieved similar approvals and certifications from the U.S. Forest Service.  (*Id*.)  And given how tightknit the industry is, the Plaintiffs themselves have become strongly associated with the Fortress brand.

5

**B.    Compass Acquired Fortress**

Attracted by Plaintiffs' proven track record of success with creating an innovative fire-retardant company, Compass was an early investor and gradually increased its ownership to become an approximately 45% minority shareholder of Fortress between 2019 and October 2021. (Burnham Decl. ¶ 4.)  On May 5, 2023, the Parties entered into the MIPA, whereby Compass purchased the remaining ownership units in Fortress and all of its assets, including its valuable intellectual property portfolio encompassing over 30 proprietary fire retardant patents.  (*Id.*; Ex. A (MIPA).)    The Purchase Price included an upfront payment of approximately $27,000,000, Milestone Payments that could earn up to an additional $28,000,000, and uncapped Earn-Out Payments reflecting a percentage of Fortress' future sales based on a per gallon fee due to Sellers. (Ex. A (MIPA) § 2.02(a).)

Kevin S. Crutchfield, the then-president and CEO of Compass, trumpeted the purchase in a press release issued by Compass on the date of the sale:

> The value creation possible through the full integration of Fortress' patented portfolio of next-gen fire retardant formulations with our extensive logistics and production capabilities made this acquisition a priority for our company . . . .  With the recent milestones attained by Fortress, our confidence in its earnings potential is bolstered as we gain a share of the next-gen fire retardant market, a counter-seasonal opportunity and sizeable addressable market that is now open to us. We are pleased to welcome the Fortress team into the Compass Minerals family.[3]

Because Compass had no experience in the fire-retardant industry, the Parties structured the deal to ensure that Fortress' existing leadership—most notably, Burnham and Ashker—would continue to lead Fortress' business.  Compass thus executed new two-year employment agreements

---

[3] Press Release, Compass Minerals, Compass Minerals Announces Acquisition of Outstanding 55% Interest in Fortress North America (May 9, 2023), https://investors.compassminerals.com/investors-relations/investor-news/press-release-details/2023/Compass-Minerals-Announces-Acquisition-of-Outstanding-55-Interest-in-Fortress-North-America/default.aspx.

with Burnham as CEO and Ashker as COO of Fortress.  (Burnham Decl. ¶ 6; Ashker Decl. ¶ 6.) As reflected in Section 2.03(b) of the MIPA, the Parties understood that Plaintiffs' continued leadership was essential to Fortress' success due to their experience in the fire-retardant industry. (*See* Ex. A (MIPA) § 2.03(b)(iii) and (iv) (providing for 2-year employment agreements with both Burnham and Ashker).)

Additionally, because it was essential to Fortress' success that Fortress maintain the goodwill and name recognition as an innovator that Plaintiffs had built up over the years, including having successfully partnered with the U.S. Forest Service, and because Compass had no prior experience or goodwill in the fire-retardant space, the MIPA required Compass to "operate [Fortress] . . . ***under [its] existing name and branding for a period of two (2) years*** following the Closing and . . . use Commercially Reasonable Efforts to operate [Fortress] as [a] wholly-owned subsidiar[y] ***substantially separate from [Compass]***."  (Ex. A (MIPA) § 2.08(c)(i)(C); *see also* Burnham Decl. ¶¶ 5, 7.)  These terms were not only material to the deal, they were of central significance; Plaintiffs would never have sold Fortress to Compass without them.  (Burnham Decl. ¶ 5–7; Ashker Decl. ¶ 5–7.)

Under the MIPA, the Purchase Price for Fortress consisted of:  (1) a modest upfront Closing Payment; (2) Milestone Payments based on Fortress' achievement of certain business objectives; and (3) Earn-Out Payments based on the number of gallons of product sold between the MIPA's Closing Date and December 31, 2032.  (Ex. A (MIPA) at pp. 11, 15–17.)  Notably, the Earn-Out Payments have no ceiling cap, and would have continued to increase with Fortress' sales. Therefore, the MIPA contemplated that Plaintiffs would receive the vast majority of consideration for the sale of their shares through their continued support of Fortress' growth and success.

Furthermore, the Parties recognized that, in the event of a material breach of the MIPA, monetary damages would be near impossible to calculate due to the performance-based payment structure, and even if such damages could be calculated, they would be a wholly inadequate remedy for any material breach.  Indeed, the future growth and success of a company built through Burnham and Ashker's tireless hard work was paramount, whether Plaintiffs received the maximum compensation contemplated by the MIPA or not.  (Burnham Decl. ¶ 7; Ashker Decl. ¶ 7.)  As a result, the MIPA provided for specific performance and indemnification as the exclusive remedies for contractual breaches.

Specifically, Section 6.07 of the MIPA provides that:

**Section 6.07  Exclusive Remedies**.  Subject to <u>Section 8.11</u> [providing for specific performance], the Parties acknowledge and agree that from and after Closing their sole and exclusive remedy with respect to any and all claims . . . for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be pursuant to the indemnification provisions set forth in this <u>Section 6.07</u>. . .

(Ex. A (MIPA) § 6.07.)

And Section 8.11(a) of the MIPA expressly provides that:

**Section 8.11 Remedies; Specific Performance.**

(a) The Parties agree that irreparable damage and harm would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that, although monetary damages may be available for such a breach, monetary damages would be an inadequate remedy therefor.  Accordingly, each of the Parties agrees that, in the event of any breach or threatened breach of any provision of this Agreement by such Party, the other Party shall be entitled to . . . specific performance and other equitable relief to prevent or restrain breaches or threatened breaches hereof and to specifically enforce the terms and provisions hereof in addition to any other remedy to which they are entitled at law or in equity, without the requirement of providing or posting any bond or other security.

(Ex. A (MIPA) § 8.11(a).)

In this case, Plaintiffs seek specific performance because no measure of damages could make them whole from the irreparable harm caused by the (untimely) demise of Fortress.

8

## C.    Compass Breached the MIPA

Despite the fact that the MIPA required Compass to "operate [Fortress] . . . ***under [its] existing name and branding for a period of two (2) years*** following the Closing and . . . use Commercially Reasonable Efforts to operate [Fortress] as [a] wholly-owned subsidiar[y] ***substantially separate from [Compass]***," (Ex. A (MIPA) § 2.08(c)(i)(C)), shortly after executing the MIPA, Compass folded nearly all of Fortress' operations into the Compass brand.  (Burnham Decl. ¶ 8; Ashker Decl. ¶ 8.)  Compass—which had no prior experience or reputation in the fire retardant industry—eliminated Fortress' independent email, website, branding, marketing, and many of its employees.  (Burnham Decl. ¶ 8; Ashker Decl. ¶ 8.)  Contrary to the requirements of Section 2.08 of the MIPA, Fortress, for all intents and purposes, ceased to exist as a stand-alone entity and was instead reimagined as the retardant-producing wing of Compass.

Furthermore, in August 2023, less than three months after executing the MIPA and new employment agreements with Plaintiffs, Compass abruptly terminated Burnham as CEO without cause.  (Burnham Decl. ¶ 8.)  Around the same time, Compass stripped Ashker of his day-to-day authority as COO, and eventually terminated him without cause on October 13, 2023.  (Ashker Decl. ¶ 8.)  Compass replaced these proven leaders with Compass employees who had no experience in the fire-retardant industry, let alone federal government contracting, thereby beginning a process that crippled Fortress' operations.  (Burnham Decl. ¶ 8–9; Ashker Decl. ¶ 8.)

Unsurprisingly, these decisions caused Fortress' business to struggle.  On March 25, 2025, Compass announced in its 8-K filing with the SEC[4] that:  "[Compass] began the process of exiting the Fortress North America, LLC . . . fire retardant business, and . . . terminated the employment of all Fortress employees."  (Ex. B (Compass 8-K).)  Accordingly, Compass has failed to operate

---

[4] A copy of Compass' March 25, 2025 8-K is attached to the Kurtzberg Decl. as Exhibit B.

Fortress for the contractually mandated two-year period (until at least May 5, 2025). And moreover, Compass was required to operate Fortress as a ***separate entity*** "***under [its] existing name and branding***" during that two-year period—an obligation Compass disregarded altogether after only a couple of months.

## D.    Time Is of the Essence

Shocked and disappointed by Compass' decision to shut down Fortress, Burnham and Ashker filed this suit on April 8, 2025, asserting four causes of action: breach of contract (seeking specific performance), breach of the implied covenant of good faith and fair dealing, unjust enrichment, and declaratory judgment. (ECF No. 1-2) Burnham and Ashker also immediately reached out to Compass in an attempt to resolve this dispute. (Burnham Decl. ¶ 10; Ashker Decl. ¶ 9.) Burnham and Ashker felt that they were making progress in those discussions, until May 2, 2025, when Compass ceased communications. (Burnham Decl. ¶ 10; Ashker Decl. ¶ 9.) Then, on May 5, 2025, Compass informed Plaintiffs that it had entered into an exclusive 20-day period within which to finalize a sale of Fortress and/or its assets to a third party. (Burnham Decl. ¶ 10; Ashker Decl. ¶ 9.) This 20-day exclusive period ends on Thursday, May 22, 2025; therefore, a sale appears to be imminent. (Burnham Decl. ¶ 10; Ashker Decl. ¶ 9; Kurtzberg Decl. ¶ 2.)

Left with no alternatives, Plaintiffs filed this motion. A sale of Fortress or its assets would shutter the Company permanently and destroy any remaining value the Fortress brand still has, thereby rendering Plaintiffs' prayer for relief for specific performance of the MIPA impossible. By failing (1) to maintain Fortress as a separate business "under [its] existing name and branding[,]" that is "substantially separate from [Compass]"and (2) operate Fortress as such for at least two years, Compass materially breached the MIPA, causing Plaintiffs irreparable harm and necessitating injunctive relief barring any sale of Fortress and/or its assets to a third party.

## LEGAL STANDARDS

"In the Second Circuit, the same legal standard governs the issuance of preliminary injunctions and [TROs]." *Mahmood* v. *Nielsen*, 312 F. Supp. 3d 417, 421 (S.D.N.Y. 2018); *see also Andino* v. *Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) ("It is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction."). To obtain either, Plaintiffs must show: "(1) a likelihood of success on the merits . . . ; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction." *Benihana, Inc.* v. *Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015). Here, Plaintiffs satisfy all four factors.

## ARGUMENT

### I.   Plaintiffs Are Likely to Prevail on Their Breach of Contract Claim

The first factor for entry of a temporary restraining order and preliminary injunction—likelihood of success on the merits of Plaintiffs' breach of contract claim—is easily satisfied. Under New York law, the elements of a breach of contract claim include "(1) the existence of a contract, (2) performance by the party seeking recovery, (3) breach by the other party, and (4) damages suffered as a result of the breach." *Zam & Zam Super Market, LLC* v. *Ignite Payments, LLC*, 736 F. App'x 274, 276 (2d Cir. 2018).[5] All of these elements are met here.

*First*, the Parties do not dispute that they entered into a valid contract when they executed the MIPA in May 2023. The MIPA obligated Plaintiffs to transfer their ownership interests in Fortress to Compass, and, as relevant to this motion, obligated Compass to operate Fortress as a

---

[5] The MIPA is governed by New York law. (*See* Ex. A (MIPA) § 8.10(a).)

separate entity with its own branding for a period of at least two years. (Ex. A (MIPA) § 2.08(c)(i)(C).)

**Second**, there is also no dispute that Plaintiffs performed their obligations under the MIPA, transferring their ownership interests to Compass. (Burnham Decl. ¶ 4–6; Ashker Decl. ¶ 4.)

**Third**, Compass breached Section 2.08(c)(i)(C) of the MIPA.[6] As described in Section C above, shortly after acquiring Fortress, Compass completely disregarded Fortress' independent identity—including but not limited to, removing its branding, shutting down its website, and laying off its key leadership—all in violation of the commitment Compass made to Plaintiffs in the MIPA. (Burnham Decl. ¶ 5, 8; Ashker Decl. ¶ 5, 8.) Even had Compass maintained Fortress as a separate entity, as required under the MIPA, Compass still failed to operate Fortress as a separate entity for the contractually mandated term of two years. The Parties entered into the MIPA on May 5, 2023, and Compass shut down Fortress' operations entirely on March 25, 2025—i.e., two months early. This is as straightforward of a contractual breach as one could imagine.

**Fourth**, Plaintiffs have been damaged by this breach. In 2023, Fortress was an industry-disrupting company, which had just signed a multi-million dollar contract with the U.S. Forest Service for the use of its innovative products. (Burnham Decl. ¶ 3.) Less than two years later, because of Compass' material breaches, Fortress' reputation, brand-recognition, customer relationships, and goodwill have all been severely diminished. Compass has now shuttered Fortress' business entirely and apparently intends to sell off its assets like spare parts. (Burnham Decl. ¶ 9, 10; Ashker Decl. ¶ 9.) This is all to the detriment of Plaintiffs, who not only built

---

[6] Although Plaintiffs allege several additional material breaches of the MIPA in their Complaint (*see* ECF No. 1-2), including Compass's failure to exercise "Commercially Reasonable Efforts" in managing Fortress in violation of Section 2.08(c)(i)(A), for purposes of this motion, Plaintiffs rely on Compass' breach of Section 2.08(c)(i)(C). Plaintiffs reserve all rights as to their remaining claims.

Fortress from the ground up, but deferred their compensation for the sale of their company in favor of performance-related payments. The damage Compass has done (and continues to do) to Fortress' business is immeasurable. (*See infra* Section II.)

Not only are Plaintiffs likely to succeed on the merits of their breach of contract claim, but Plaintiffs are also entitled to the remedy of specific performance, which was explicitly bargained for in the MIPA. (Ashker Decl. ¶ 7.) As noted above, Section 8.11 of the MIPA expressly provides that, "in the event of any breach or threatened breach of any provision of this Agreement by such Party, the other Party shall be entitled to . . . specific performance and other equitable relief to prevent or restrain breaches or threatened breaches hereof and to specifically enforce the terms and provisions hereof[.]" (Ex. A (MIPA) § 8.11(a).) Courts enforce such provisions through equitable remedies, particularly where, as here, the parties are sophisticated and were represented by counsel. *See Wells Fargo Bank, N.A.* v. *Bank of America, N.A.*, 2013 WL 372149, at *8–9 (S.D.N.Y. Jan. 31, 2013) (Oetken, J.) (where sophisticated parties provide for specific performance in the contract, "their writing should as a rule be enforced according to its terms."); *Keiler* v. *Harlequin Enters. Ltd.*, 751 F.3d 64, 69 (2d Cir. 2014) ("[A] written agreement that is complete, clear, and unambiguous must be enforced according to its terms."). This provision embodies the Parties' shared belief that monetary damages would be inadequate to remedy a material breach of the MIPA which jeopardizes Fortress' business—although Fortress has experienced early success, it is still very much an emerging company, reliant on one major customer (the U.S. Forest Service), and deriving nearly all of its value from its portfolio of innovative intellectual property. *See Nimbus Therapeutics, LLC* v. *Celgene Corp.*, 570 F. Supp. 3d 100, 122 (S.D.N.Y. 2021) (finding moving party was "likely [to] succeed in establishing that specific performance of the assignment provision is an appropriate remedy" where the contract involved "a unique asset, still in

development, with no established market value" and thus, "damages would be difficult to ascertain with reasonable certainty"). Accordingly, upon Plaintiffs prevailing on their breach of contract claim, Compass should be required to specifically perform its obligations under the MIPA— operating Fortress in good faith as a separate entity for a period of at least 21 months (representing two years, less the 3 months Compass initially complied with the terms of the MIPA).

## II.    Plaintiffs Will Suffer Irreparable Harm Without Injunctive Relief

Entry of a TRO and preliminary injunction is also necessary to prevent irreparable harm to Plaintiffs should Compass attempt to move forward with a sale of Fortress and/or its assets. *See Reuters Ltd.* v. *United Press International, Inc*., 903 F.2d 904, 907 (2d Cir. 1990) ("Irreparable harm must be shown by the moving party to be imminent, not remote or speculative, and the alleged injury must be one incapable of being fully remedied by monetary damages."). Here, Plaintiffs would be irreparably harmed in three distinct ways:  (1) the destruction of Fortress' business and goodwill, which Burnham and Ashker spent years working to build; (2) monetary damages are not readily calculable, leaving Plaintiffs with no recourse if Fortress is sold; and (3) the Parties explicitly provided in the MIPA that a material breach constitutes irreparable harm and is to be remedied by injunctive relief.

***First***, it is axiomatic that a company's "loss of reputation, good will, and business opportunities" owing from a breach of contract constitute irreparable injuries. *Register.com, Inc*. v. *Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (injunctive relief is appropriate where it would be "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client"). Moreover, a "threat to the continued existence of a business" is quintessential irreparable harm, necessitating injunctive relief. *trueEX, LLC* v. *MarkitSERV Ltd*., 266 F. Supp. 3d 705, 727 (S.D.N.Y. 2017); *see also RMP Capital Corp*. v. *Bam Brokerage, Inc.*, 21 F. Supp. 3d 173, 182 (E.D.N.Y. 2014) ("[T]he loss of an ongoing business representing many

14

years of effort and the livelihood of its owners also constitutes irreparable harm that cannot be fully compensated by monetary damage."). This is exactly what will happen if Compass is allowed to sell Fortress or its assets to a third party.

As described in Section B above, the May 2023 transaction with Compass was structured in such a way as to allow for Plaintiffs to remain as Fortress' leaders and continue to grow the Company that they had invested so much of their time and hard work into. (Burnham Decl. ¶ 1, 3, 5, 7; Ashker Decl. ¶ 5–7.) However, a sale of Fortress' assets will render the Company unsalvageable, and should Plaintiffs prevail on their breach of contract claim at trial, specific performance of the MIPA will be rendered impossible. *See Brenntag International Chemicals, Inc.* v. *Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) (irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied"). Plaintiffs will have forever lost the value of their labor and dedication, including Fortress' business, reputation, and goodwill.

***Second***, "even in situations where damages are available, irreparable harm may be found . . . . where the damages flowing from the alleged breach would not be capable of reliable calculation." *Gulf & W. Corp.* v. *Craftique Prods., Inc.*, 523 F. Supp. 603, 607 (S.D.N.Y. 1981); *see also Ecolab, Inc.* v. *K.P. Laundry Machine, Inc.*, 656 F. Supp. 894, 900 (S.D.N.Y. 1987) (finding irreparable harm where the "extent of [plaintiffs'] loss may be very difficult to measure" and plaintiffs "might not be fairly compensated if left to a damage remedy"). The sale of Fortress' assets would permanently prevent any chance of reviving the business, continuing its operations, and achieving its key business objectives.

15

As discussed in Section B above, the MIPA provides for uncapped performance-based compensation to Sellers over a period of nearly ten years, which necessarily depends on the continued operation of Fortress' business. If Compass impermissibly sells Fortress' assets now, it would leave Plaintiffs with no way to earn (*or calculate*) the compensation they would otherwise be due from Fortress' future sales. This is especially true because Fortress is still an emerging company, with a very limited sales history—one major contract with the U.S. Forest Service. (Burnham Decl. ¶ 1, 3.) Fortress' value is and was derived from its valuable intellectual property portfolio and the Company's expected growth. Injunctive relief is proper in such a case where any calculation of monetary damages would be speculative at best. *See, e.g.*, *Vestron, Inc.* v. *National Geographic Society*, 750 F. Supp. 586, 591 (S.D.N.Y. 1990) (finding irreparable injury where "damages could . . . not be readily calculated" because sales of the product at issue were "cut off almost at its inception, thus making it impossible to project future sales on the basis of any track record"; "Once that momentum is disrupted, it affects subsequent sales to an indeterminate extent"); *Gulf & W. Corp.*, 523 F. Supp. at 608 (finding that damages could not be calculated where sales "momentum has dissipated due to the lapse in . . . marketing efforts"); *Jacobson & Co.* v. *Armstrong Cork Co.*, 548 F.2d 438, 444–45 (2d Cir. 1977) (holding that loss of "potential customers" constitutes irreparable harm because it is "neither calculable nor compensable in dollars and cents").

***Third***, without an injunction, Plaintiffs will be deprived of the legal recourse they specifically bargained for in the MIPA. Where, as is the case here, a contract explicitly provides for specific performance, the denial of that remedy is, in and of itself, routinely found to constitute irreparable harm. *See Wells Fargo Bank*, 2013 WL 372149, at *8–9 ("When specific performance is contemplated by the contract, courts tend to find that irreparable harm would be suffered unless

specific performance is granted."). Moreover, the Parties agreed that "monetary damages would be an inadequate remedy" for a breach of the MIPA, as such a breach would cause "irreparable damage and harm[,]" and therefore, the non-breaching party "shall be entitled to an injunction." (Ex. A (MIPA) § 8.11(a).) While not dispositive—and as just described, Plaintiffs have presented ample further evidence of irreparable harm—"courts may view [a contractual stipulation of irreparable harm] as evidence of an admission that irreparable harm has occurred." *Roswell Capital Partners LLC* v. *Alternative Construction Technologies*, 2009 WL 222348, at *17 (S.D.N.Y. Jan. 30, 2009) (citing *North Atlantic Instruments, Inc.* v. *Haber*, 188 F.3d 38, 49 (2d Cir. 1999). That is particularly so where, as here, the parties are sophisticated entities represented by counsel. *See National Elevator Cab & Door Corp.* v. *H&B, Inc.*, 282 F. App'x 885, 887 (2d Cir. 2008) (where defendant was "a sophisticated business entity" that "had signed the Agreement after consulting with counsel," a stipulation of irreparable harm was an "additional factor weighing in favor of" granting a preliminary injunction) (citing *Ticor Title Insurance Co.* v. *Cohen*, 173 F.3d 63, 69 (2d Cir. 1999)); *Marsh & McLennan Agency, LLC* v. *Alliant Insurance Servs., Inc.*, 2025 WL 304500, at *5 (S.D.N.Y. Jan. 27, 2025) (stipulation of irreparable harm in contract "serves as an additional factor in favor of concluding that [plaintiff] has shown a likelihood of irreparable injury"). Accordingly, the Parties should be held to the terms that they negotiated and agreed upon in the MIPA.

**III.   The Balance of Equities Weighs Decisively in Plaintiffs' Favor**

In considering whether to grant an injunction, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Yang* v. *Kellner*, 458 F. Supp. 3d 199, 216 (S.D.N.Y. 2020), *aff'd sub nom. Yang* v. *Kosinski*, 805 F. App'x 63 (2d Cir. 2020), *and aff'd sub nom. Yang* v. *Kosinski*, 960 F.3d 119 (2d Cir. 2020).

Here, on the one hand, as described in Section II above, Plaintiffs stand to suffer irreparable harm without immediate injunctive relief.  On the other hand, however, Compass would, at worst, face a minor delay in receiving compensation if enjoined from immediately selling Fortress or its assets.  A preliminary injunction would serve its purpose of maintaining the status quo while the Court considers the merits of Plaintiffs' claims, and should the injunction eventually be lifted, Compass could be returned to exactly the same position as it currently sits.  Accordingly, the balance of hardships supports granting Plaintiffs' requested relief.

## IV.    Injunctive Relief Serves the Public Interest

The final factor, which considers the public interest, also weighs in favor of injunctive relief.

*First*, as discussed previously, the fire-retardant industry is highly concentrated, with only one other competitor having had a similar product earn a place on the U.S. Forest Service's Qualified Products List.  The removal of Fortress from the marketplace, and presumptive sale of its assets to a competitor, threatens to consolidate this industry even further.  Given the growing need for innovation in the country's efforts to combat wildfires, it is not in the public interest to stifle innovation by summarily shuttering Fortress, particularly when Compass has a contractual obligation not to do so.

*Second*, there is a strong public interest in holding contracting parties to their bargained for agreements.  *See Rex Medical L.P.* v. *Angiotech Pharmaceuticals (US), Inc*., 754 F. Supp. 2d 616, 626 (S.D.N.Y. 2010) ("The public has an interest in seeing that parties oblige by their contractual obligations and are not allowed to skirt such obligations at another's expense."); *Espiritu Santo Holdings, LP* v. *L1bero Partners, LP*, 2019 WL 2240204, at \*26 (S.D.N.Y. May 14, 2019) (holding that there is a "strong public interest in enforcing contracts").  Here, as described in Section C above, Compass has plainly and unambiguously breached the Parties'

MIPA.  Allowing Compass to now profit from this breach would only serve to reward Compass' wrongful conduct, thereby contravening the public's trust.

The public interest is served by an injunction preserving the status quo pending full adjudication of these matters.

## CONCLUSION

Plaintiffs respectfully request that this Court grant Plaintiffs' motion for a temporary restraining order and preliminary injunction.


DATED:    May 20, 2025


By: */s/ Joel Kurtzberg*

        Joel Kurtzberg
        Sesi Garimella
        Jason M. Ecker
        32 Old Slip
        New York, NY 10005
        (212) 701-3000

        *Attorneys for Plaintiffs*

## <u>CERTIFICATION OF COMPLIANCE</u>

The total number of words contained herein, exclusive of the cover page, certificate of compliance, table of contents, and table of authorities, is 5,908 words.

Date: May 20, 2025

By: */s/ Joel Kurtzberg*

Joel Kurtzberg
Sesi Garimella
Jason M. Ecker
32 Old Slip
New York, NY 10005
(212) 701-3000

*Attorneys for Plaintiffs*